**Electronically Filed
Intermediate Court of Appeals
CAAP-21-0000387
28-JUN-2022
07:58 AM
Dkt. 88 MO**

NO. CAAP-21-0000387

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

AB, Petitioner-Appellant, v.
MF, Respondent-Appellee

APPEAL FROM THE FAMILY COURT OF THE SECOND CIRCUIT
(FC-P NO. 18-1-0175)

MEMORANDUM OPINION
(By:  Ginoza, Chief Judge, Leonard and Nakasone, JJ.)

This appeal stems from Petitioner-Appellant AB's
(**Father**) November 13, 2019 "Motion for Post-Decree Relief for
Sole Custody with Supervised Visitation to Mother" (**Motion for
Sole Custody**) of the parties' minor female child (**Child**) and
March 18, 2021 "Motion to Address Excessive False Allegations and
Contempts of Court and Manipulation and Awardment of Petitioner's
Attorneys' Fees" (**Motion to Address Allegations**).  Father appeals
from the corresponding May 26, 2021 "Written Findings of Facts
Conclusions of Law, Decisions and Orders Following Trial"
(**5/26/21 FOFs/COLs and Order**)[1] entered by the Family Court of the
Second Circuit (**Family Court**) which denied Father's motions.[2]

---

[1]  On July 23, 2021, the Family Court entered "Errata Sheet Re: [5/26/21
FOFs/COLs and Order]" to "correct/revise a few non-substantive, typographical,
grammatical errors that would not affect the substance of the court's orders."

[2]  The Honorable Adrianne N. Heely presided.

On appeal, Father contends the Family Court erred by: (1) finding no evidence that Respondent-Appellee MF (**Mother**) coached or "brainwashed" Child into making child abuse and child molestation allegations; (2) rejecting Father's assertion that Mother, Mother's family, and Mother's counsel are trying to ruin Father's life and keep Child out of his life, and awarding Mother sole legal and physical custody; and (3) finding Mother credible in its 5/26/21 FOFs/COLs and Order where the Family Court previously found Mother not credible.  Related to these points of error, Father challenges finding of fact (**FOF**) 1.45(3) and footnotes 65 and 69, FOF 1.45(11), and conclusions of law (**COLs**) 2.01, 2.03, 2.26, and 2.7.

For the reasons set out below, we affirm.

## I.  Background

Father and Mother are the natural parents of Child, who was born in 2015.  On August 8, 2018, Father filed his Petition for Paternity when Child was three years old requesting, *inter alia*, joint legal custody, physical custody to Mother with rights of reasonable visitation to Father, and that the Department of Health prepare a new Certificate of Live Birth inserting Father's name as the natural father of Child.  On August 28, 2018, Mother filed her Answer to Father's Petition for Paternity and a Cross-Petition on Behalf of Child for Termination of Parental Rights of Petitioner (**Cross-Petition**).  In her Cross-Petition, Mother requested sole legal and physical custody of Child with no visitation to Father and argued, *inter alia*, that at the time of Child's conception, there were non-consensual sexual relations between Mother and Father.  After an evidentiary hearing on October 24, 2018, the Family Court entered its November 15, 2018 Findings of Fact, Conclusions of Law, and Order (**Order Re: Mother's Cross-Petition**)[3] denying Mother's Cross-Petition.

On December 6, 2018, the Family Court entered an Expedited Order Regarding Visitation which, *inter alia*, granted

---

[3]  The Honorable Lloyd A. Poelman presided.

2

Father supervised visitation and adopted Father's proposal of graduated unsupervised visits with unsupervised overnight visits beginning four months after the entry of the order.  Thereafter, Father and Mother had difficulty co-parenting and communicating, such as Father un-enrolling Child from her school without consulting Mother and Mother filing several police reports and temporary restraining orders (**TROs**) against Father.  The record reflects that between April 2019 and October 2019, Mother filed five TROs, four of which were filed on behalf of Child alleging Father sexually or physically abused Child.

On November 13, 2019, Father filed his Motion for Sole Custody.  On December 29, 2020, the Family Court granted Father's request to withdraw his counsel and proceed *pro se*.  Self-represented Father then filed his Motion to Address Allegations and after a three day trial, the Family Court entered its 5/26/21 FOFs/COLs and Order.  This appeal followed.

## II.  Standards of Review

> Generally, the family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion. Thus, we will not disturb the family court's decision on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

DL v. CL, 146 Hawaiʻi 415, 420, 463 P.3d 1072, 1077 (2020) (quoting Brutsch v. Brutsch, 139 Hawaiʻi 373, 381, 390 P.3d 1260, 1268 (2017)).

> It is well established that a family court abuses its discretion where "(1) the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant; (2) the family court failed to exercise its equitable discretion; or (3) the family court's decision clearly exceeds the bounds of reason."

Id. (quoting Brutsch, 139 Hawaiʻi at 381, 390 P.3d at 1268).

The appellate court reviews the family court's FOFs under the "clearly erroneous" standard.  W.N. v. S.M., 143 Hawaiʻi 128, 133, 424 P.3d 483, 488 (2018) (citing Waldecker v. O'Scanlon, 137 Hawaiʻi 460, 466, 375 P.3d 239, 245 (2016)).

> A FOF is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. "Substantial evidence" is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

Id. (quoting Waldecker, 137 Hawaiʻi at 466, 375 P.3d at 245). The family court's COLs are reviewed de novo under the right/wrong standard.  Id. (citing Waldecker, 137 Hawaiʻi at 466, 375 P.3d at 245).

### III.  Discussion

### A.  Findings on Mother's Credibility

We first address Father's third point of error that the Family Court erred in FOF 1.45(11) by finding Mother credible in its 5/26/21 FOFs/COLs and Order, which contradicts the Family Court's previous finding in its Order Re: Mother's Cross-Petition that Mother is not credible.

The Order Re: Mother's Cross-Petition found, in pertinent part:

> 1.  The parties met and began dating in June 2014. Both were students at the University of Hawaii - Maui Campus at the time.
>
> 2.  Approximately two (2) weeks into their relationship, the parties began having sexual relations.
>
> 3.  In or around September 2014, the parties learned that Mother was pregnant with [Child].
>
> . . . .
>
> 6.  Father testified that all of the sexual encounters between the parties were consensual. He testified that there was never an occasion on which Mother expressed, in any way, that she did not want to have sex with Father. Father testified that all but one of their encounters occurred at his residence, which he shared with his parents, in his bedroom. That single other occasion was at her residence, which she shared with her parents, in her bedroom. Father testified that Mother drove to Father's house for most of those encounters. The court finds Father's testimony credible.
>
> 7.  Mother testified that in late July 2014, Father had non-consensual sex with her. She testified that every single sexual encounter thereafter was non-consensual. Mother testified that between that first non-consensual encounter in late July 2014 and September 25, 2014, the parties had sex one to two times per week. Mother then contradicted

4

herself and testified that the frequency was zero to one time per week. Mother agreed, however, that during that period of time the parties had multiple sexual encounters, and that they occurred at Father's residence in his bedroom.

8.  In describing the non-consensual nature of their sexual relationship, Mother testified that sometimes she would simply indicate to him verbally that she was not interested, but he persisted. On other occasions, she testified, Father physically restrained her.

9.  [Child] was born in May 2015 following a normal, full-term pregnancy, placing the date of conception sometime between late August 2014 and early September 2014.

.  .  .  .

16.  The court finds that on the issue of sexual assault, Father's testimony is credible and Mother's testimony is not. The court specifically finds not credible Mother's testimony that during the entire period of time in which conception occurred the parties had multiple sexual encounters, all of which were non-consensual. The court cannot find, therefore, that [Child]'s birth was the result of a sexual assault committed by Father on Mother.

(Emphases added.)  The 5/26/21 FOFs/COLs and Order found in relevant part:

1.45 At the evidentiary hearings on Father's Motions the court heard for [sic] the following witnesses:

.  .  .  .

11)  [Mother], Mother testified that she had a sexual relationship with Father, mainly nonconsensual, and after she got pregnant their relationship turned rocky . . . Mother testified of the activities she and [Child] like to do . . . Mother also testified that Father had not been a part of his daughter's life, however he did reach out a couple of times, but never followed through with trying to bond with his daughter . . . . Mother also testified about Adverse Child Experiences ("ACES") and noticing something happening (rolling in ball, grinding her teeth, rocking back and forth, saying she does not want to go before visits, becoming withdrawn) to her daughter feel [sic] that it's not in the best interest of her child to have the visits with Father continue until it [sic] can figure it out. She also testified that Father does not have the ability to co-parent or follow the good co-parenting guidelines, as during exchanges she was called names (B-I-T-C-H or asshole) by Father or Father's family as they rolled down the window as [Child] was in the car; would like Father to take Anger Management and Parenting classes; and possible therapy with child; and until he does would like visits suspended. The court finds this witness credible.

(Emphases added.) (Footnotes omitted.)

With regard to Father's argument that the Family Court's credibility determinations contradict each other and thus

5

FOF 1.45(11) is clearly erroneous, the credibility determination in the Order Re: Mother's Cross-Petition is specific to Mother's testimony on the issue of sexual assault, that during the entire period of time in which conception occurred the parties had multiple sexual encounters, all of which were non-consensual. "It is for the trial judge as fact-finder to assess the credibility of witnesses and to resolve all questions of fact; the judge may accept or reject any witness's testimony in whole or in part." State v. Eastman, 81 Hawaiʻi 131, 139, 913 P.2d 57, 65 (1996) (citing Lono v. State, 63 Haw. 470, 473, 629 P.2d 630, 633 (1981)). Moreover, "[i]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." In re Doe, 95 Hawaiʻi 183, 190, 20 P.3d 616, 623 (2001) (citation omitted).

We conclude the Family Court did not err in finding Mother's testimony credible, except with regard to her testimony that her sexual relationship with Father was mainly nonconsensual. To the extent that FOF 1.45(11) contradicts the Order Re: Mother's Cross-Petition without explanation, we strike as clearly erroneous the portion of FOF 1.45(11) finding credible Mother's testimony that she had a "mainly nonconsensual" sexual relationship with Father.

**B.    Findings Regarding Coaching of Child**

Father contends that the Family Court erred in the portion of FOF 1.45(3) and related footnote 65 finding there is no evidence Mother and Mother's family are coaching Child to make false allegations against Father. Father asserts the challenged findings are "inconsistent with the overwhelming evidence in the record below that all of the purported allegations of [Child], which were first reported by [Mother] and/or a member of her family, were not confirmed by [Department of Human Services (**DHS**)] experts."[4] (emphasis omitted).

_____

[4]  FOF 1.45(3) provides, in relevant part:

(continued...)

Notwithstanding Father's argument, the Family Court's finding is not inconsistent with the evidence that DHS could not confirm the allegations because the inability to confirm the allegations against Father does not establish that Mother and her family "brainwashed" or coached Child into making those allegations.  The Family Court's finding that there is no evidence Child was coached is also supported by substantial evidence in the record and the testimony of witnesses the Family Court found to be credible, including Stein (who "was received by the parties as an expert in the field of custody and abuse and neglect and domestic violence"), Maternal Grandmother, and Mother.

Mother filed the first TRO on behalf of Child after Father's first unsupervised overnight visit with Child, alleging that Child told Mother that Father bathed her while Father was also naked.  During the trial, Father testified that during the first overnight visit, Father bathed Child while naked.  Stein testified that Child had "a very, ah, abrupt behavioral change that happened after a visitation" that Stein believed occurred after the first overnight visitation with Father.  Stein also testified she was concerned because "there has been, ah, a visitation schedule set up that included overnights.  And then the child was coming home from those in -- in a seemingly traumatized state."

During recross-examination by self-represented Father, Stein testified at trial regarding the possibility Child is being coached as follows:

---

[4](...continued)
     1.45 At the evidentiary hearings on Father's Motions the
     court heard for [sic] the following witnesses:

     . . . .

     3) [Father] . . . . Father also argues that Mother and
     Mother's family is brainwashing and coaching minor child to
     make false child abuse and child molestation allegations.

The footnote to this sentence, footnote 65 states: "The court finds no evidence of this and has heard from witnesses that this is not happening; see trial testimony of Father, Mother, [Lee Stein (**Stein**)], and Maternal Grandmother[.]"

> [Father:]  Could the abrupt change be from being coached by the mother?  Cuz what -- what mother is coaching –
>
> THE COURT:  Let her answer the question before you get to another question.
>
> [Stein:]  What was the last question?
>
> THE COURT:  Ah, could the abrupt change be as a result of being coached by the mother?
>
> [Stein:]  Oh, ah, I have seen no evidence that mother's coaching and/or the family members.  I understand that you believe that. Um, I would have to know that that happened. And I have testified in three cases where children were coached and so I know how to recognize that.
>
> Um, and I haven't seen it yet.  I haven't seen anything about that.

Father does not challenge FOF 1.45(6), which relates to Stein's testimony and provides in pertinent part:

> 6)  [Stein], . . . . Ms. Stein read documents in the matter . . . and has never met the minor child[], but <u>has concerns based on the best interest of the child, that there was a very abrupt behavioral change that happened after the first overnight visitation with the Father, leaving the child feeling very afraid and a change in child's behavior ever since then</u>, with the child returning to her home (Mother's/Maternal Grandparents) in a seemingly traumatized state, curling into a ball; <u>child has not gotten more comfortable with Father</u>; exchanges are very problematic and chaotic; and there are problems with the co-parenting[.]
>
>  . . . .
>
> On cross-examination Father as [sic] Ms. Stein if she was aware of the trial where Father was found credible and mother not credible; or the five TROs Mother filed against Father; and also suggests: . . . a time out from visiting with Father; <u>since the crawling up into a ball happens when returns [sic] from father's house; a hyperactive stress response</u>, a was [sic] that the central nervous system responds to fear in the brain; freezing up or a disassociation; and a not wanting to go and crying and crying not wanting to go to Father's house; <u>and not as a result of Mother coaching child and sees no evidence of Mother or Mother's family coaching child</u>[.] . . . . This court finds Ms. Stein's testimony credible.

(Emphases added.) (Footnote omitted.)  See In re Doe, 99 Hawaiʻi 522, 538, 57 P.3d 447, 463 (2002) (unchallenged findings of fact are binding on appeal).

Father also does not challenge FOF 1.45(10), which relates to Maternal Grandmother's testimony and provides in pertinent part:

> 10)  [Maternal Grandmother] . . . . has noticed [Child] very withdrawn after visits and a dramatic change in her usually

8

talkative, playful behavior; numerous times she noticed [Child] shut down, and run and find the nearest corner and curl up into a ball (Exhibit "F"); she felt something was not right; she also testified that the TRO's that [Mother] filed on behalf of [Child] against Father was necessary and in child's best interest . . . she testified that she was occasionally present at exchanges and seen the effects on [Child] and the changes in her life; and she prays for [Child] every day as she noticed drastic changes since having to visit with her Father. The court finds this witness credible.

Mother testified with regard to the TROs and police reports against Father as follows:

THE COURT:  Do you want to -- are you able to answer the question whether you feel it's better to contact the police than [Father]?

[Mother:]  So, for my work, I am a mandated reporter.  So even with clients that walk into our working place I know how to address certain concerns. So when it came to the TRO's I notice the concern.  So I did go to the authorities, which I was trained to do. As her vaginitis that was included in the TRO's.

[Father:]  Why would you -- why would you keep filing police reports instead of trying to communicate with me?

[Mother:]  Again, it's difficult to communicate with you. As whenever I do for a health related thing with [Child] you do not respond.

. . . .

[Father:]  So you think the way that you handled what was happening to [Child] was in the best interest of the child?

[Mother:] I do.  Because as a concerned parent I will report it to the best people that I think is the best person to handle it.  Which was to report it to Maui Police Department, especially when it came to disclosures that [Child] was telling me upon return.

The Family Court's finding that there is no evidence Child was "brainwashed" or coached to make false abuse allegations against Father is directly supported by Stein's testimony that she does not believe Child is being coached.  The Family Court's finding is also supported by: Maternal Grandmother's testimony regarding Child's negative behavioral changes after unsupervised visits with Father and that Maternal Grandmother believed the TROs were necessary and valid; Stein's testimony that the first overnight visit with Father left Child feeling very afraid and that Child's crawling into a ball after

9

visits with Father was a hyperactive stress response; and Mother's testimony that she believed it was in Child's best interest to report Child's disclosures to authorities rather than discuss them with Father.

Based on our review of the record, FOF 1.45(3) and footnote 65 are not clearly erroneous.

## C. Findings and Conclusions of Law Regarding Parental Alienation

Finally, Father contends the Family Court erred in the portion of FOF 1.45(3) and related footnote 69 which disagreed with Father's argument that Mother, Mother's family, and Mother's counsel are trying to ruin his life because Father presented evidence that Mother engaged in a pattern of "parental alienation" by interfering with Father's visitation schedule and by filing multiple police reports and TROs.[5] Father also argues the Family Court erred in awarding sole legal custody of Child to Mother (COLs 2.01 and 2.03), awarding sole physical custody of Child to Mother (COL 2.26), and finding Mother in compliance with court orders and that Father's time with Child has had a negative effect on Child's welfare (COL 2.7), because Mother engaged in parental alienation.[6]

---

[5] FOF 1.45(3) states, in relevant part:

> 3) [Father] . . . . Father argues that Mother is using [Child] as a tool to destroy his life and in turn hurt [Child] in the hopes to keep [Child] out of Father's life. . . . The court finds father's testimony credible as to him wanting to be a part of [Child]'s life, and his inability to communicate with Mother, <u>but disagrees with Father's argument that Mother, Mother's family, and Mother's counsel are trying to ruin his life and doing perverted and evil things, and committing contempt of court and manipulation</u>.

(Emphasis added.) (Footnotes omitted.)

Footnote 69 states in pertinent part, "Father also argues Mother's fixation on [Child]'s vagina is perverted and insane (Exhibit "41); but Mother testified as to the reasons she took [Child] to doctor re: vaginitis or diaper rash cream; The court also disagrees with Father's argument that Mother's actions in responding to [Child's] health and welfare, is perverted and/or insane." Father does not provide any cogent argument regarding footnote 69. Accordingly, this point has been waived. <u>See</u> Hawaiʻi Rules of Appellate Procedure Rule 28(b)(7).

[6] COLs 2.01, 2.03, 2.26, and 2.7 state, in pertinent part:

(continued...)

10

Although Father claims that Mother engaged in "parental alienation," and argues that the Family Court clearly erred in rejecting his claim, Father fails to show that the record supports his claim. Cf. JR v. IR, No. CAAP-17-0000919, 2019 WL 363471, at *4 (Haw. App. Jan. 25, 2019) (noting the testimony of a clinical and forensic psychologist regarding parental alienation behaviors exhibited by the parties' child). Instead, Jennifer Purcell (**Purcell**) testified she was appointed as Custody Evaluator and had signed contracts from both parties on or about August 4, 2020. In the Family Court's Order Appointing Custody Evaluator, Purcell was ordered to focus her investigation on, inter alia, "parental alienation/alignment". However, Purcell testified that she received an email from Father on September 9, 2020, asking her to withdraw from her services because he believed Purcell had a conflict. Purcell also testified Father indicated that he wanted her to go through an excess of 800 pages

---

[6](...continued)
> 2.01.  It is in the minor child's best interests that Mother be awarded sole legal custody with Father have [sic] rights of meaningful contact.
> . . . .
> 2.03.  Mother shall be awarded sole legal custody of [Child].
> . . . .
> 2.26.  The court has however considered the testimony of the witnesses and exhibits and heard for [sic] experts in certain fields, and finds it in the [best interest of the child] that Mother be awarded sole physical custody of the minor child as mother is currently the primary caregiver and is cable [sic] of providing the minor child with a safe environment, participate in the minor child's therapy sessions and has substantial evidence that mother acts in the best interest of the minor child.
> . . . .
> 2.7.  In considering factors enumerated in [Hawaii Revised Statutes (**HRS**)] §571-46(b), the court finds as follows:
> . . . .
> Arguments have been made that one party have done things to alienate and limit time or restrict the other party's time. However the court finds Mother in compliance with the court orders of her having primary custody and Father's time with minor child has occurred pursuant to court orders have had a negative effect on the welfare of [Child] and may not be in the best interest of the child to continue until therapy counseling and parent education classes can be successfully completed.

(Footnote omitted.)

of transcripts from previous court proceedings and did not provide Purcell with the custody evaluation packet.  Purcell testified she withdrew from the case as follows:

> Q.  And so when you -- so if I'm understanding you right, the unique difference -- challenge too difficult to overcome and the lack of sufficient information to render any recommendations is why you withdrew from this case; is that correct?
>
> A.  Well, it's, ah, a multitude of things.  One being I couldn't get the initial evaluation packet back. One being that he's asked me to withdraw.  A third that he's asked -- he's accused me of having a conflict of interest.  Which I don't even know where he came up with that at.
>
> Um, you know, he was asking me to meet him with paperwork in Kahului.  He was not willing to drive to my office.
>
> Um, he was willing to only give me the paperwork he wanted, which I understand was court transcripts of matters that have already been settled.
>
> And then the refusal of my -- my paperwork, on top of him telling me that, you know, yes, he -- his lawyers withdrew from him and he needed to find counsel. When, in fact, he withdrew from his attorneys.

Father's contention that the Family Court clearly erred in rejecting his claim of parental alienation is without merit.

Father cites a Vermont Supreme Court case which explains that "[a]cross the country, the great weight of authority holds that conduct by one parent that tends to <u>alienate the child's affections</u> from the other is so inimical to the child's welfare as to be grounds for a denial of custody to, or a change of custody from, the parent guilty of such conduct." <u>Renaud v. Renaud</u>, 721 A.2d 463, 465-66 (Vt. 1998) (emphasis added).  However, Father does not specifically argue that Mother alienated Child's affections, but asserts parental alienation through Mother's alleged abuse of the TRO process to gain an advantage in the custody litigation and that Mother interfered with his visitation.

Regarding Father's argument that Mother misused the TRO process, the Family Court's 5/26/21 FOFs/COLs and Order states in relevant part:

> Father has not met his burden of proving by clear and convincing evidence that Mother has committed contempts of court or any manipulations by Mother; nor abused the TRO process (and her voluntary dismissal is not prima facie

12

evidence that a willful misuse of the protection from abuse process has occurred pursuant to HRS §571-46(b)(16))[.][7]

(Footnote omitted.)

As explained above, there is substantial evidence in the record that Mother and Mother's family had concerns over Child's well-being because of Child's negative change in behavior after visits with Father and that Mother and Maternal Grandmother believed the police reports and TROs were necessary.  Father's argument that Mother and Mother's family are manipulating Child appears to be based on his assertion that Child is being coached, of which the Family Court found no evidence.  We conclude the Family Court did not clearly err in rejecting Father's claim that Mother misused the TRO process.

Finally, Father asserts in his opening brief that Mother interfered with his visitation on at least four occasions and that he "filed contempt of court complaints against [Mother]" for violating the Family Court's orders regarding visitation. Specifically, Father argues that twice in early March 2019, Mother interfered with his visitation by taking Child to the hospital for a fever and he disputes that Child was sick.  Father

---

[7]  HRS § 571-46(b)(16) (2018) provides:

> (b)  In determining what constitutes the best interest of the child under this section, the court shall consider, but not be limited to, the following:
> . . .
> (16)  A parent's prior wilful misuse of the protection from abuse process under chapter 586 to gain a tactical advantage in any proceeding involving the custody determination of a minor. Such wilful misuse may be considered only if it is established by clear and convincing evidence, and if it is further found by clear and convincing evidence that in the particular family circumstance the wilful misuse tends to show that, in the future, the parent who engaged in the wilful misuse will not be able to cooperate successfully with the other parent in their shared responsibilities for the child. The court shall articulate findings of fact whenever relying upon this factor as part of its determination of the best interests of the child. For the purposes of this section, when taken alone, the voluntary dismissal of a petition for protection from abuse shall not be treated as prima facie evidence that a wilful misuse of the protection from abuse process has occurred.

also argues that twice in early August 2019, Mother failed to exchange Child in the manner specified by the Family Court.

The contempt of court complaints that Father asserts he made appear to be reports he made to the Maui Police Department. Although a status hearing was held regarding visitation on June 6, 2019, Father points to nothing in the record showing he raised the two March 2019 incidents at this hearing.  Our review of the record shows that Father also failed to raise the alleged incidents in his November 13, 2019 Motion for Sole Custody, and waited until his March 18, 2021 Motion to Address Allegations to raise the issue of Mother's alleged visitation interferences to the Family Court, two years after they allegedly occurred.  The Family Court rejected Father's claim that Mother committed contempt of court, and we conclude this was not error.

In sum, the Family Court did not clearly err with regard to Father's assertions about parental alienation, and the court did not err in determining that it is in the best interest of Child to award sole physical and sole legal custody to Mother.

### IV.  Conclusion

Based on the foregoing, the May 26, 2021 "Written Findings of Facts Conclusions of Law, Decisions and Orders Following Trial" entered by the Family Court of Second Circuit is affirmed, with the exception of the portion of FOF 1.45(11) which we have struck as inconsistent with the Order regarding Mother's Cross-Petition.

DATED:  Honolulu, Hawaiʻi, June 28, 2022.

On the briefs:                        /s/ Lisa M. Ginoza
                                      Chief Judge
Hayden Aluli,
for Petitioner-Appellant              /s/ Katherine G. Leonard
                                      Associate Judge
Erin Lea Lowenthal
for Respondent-Appellee               /s/ Karen T. Nakasone
                                      Associate Judge